UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| NICHOLAS MONTEL, | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
|  | ) | NO. 16-30135-WGY |
| CITY OF SPRINGFIELD, | ) | |
| WILLIAM CATELLIER, | ) | |
| LUKE COURNOYER, and | ) | |
| JUAN RODRIGUEZ, | ) | |
| Defendants. | ) | |

YOUNG, D.J.                                        June 24, 2019

**MEMORANDUM & ORDER**

## I.  INTRODUCTION

Nicholas Montel ("Montel") brought the instant suit against
the City of Springfield ("Springfield") and three Springfield
police officers, William Catellier, Luke Cournoyer, and Juan
Rodriguez (the "Officers"), alleging violations of his Fourth
and Fourteenth Amendment rights and various torts. See
generally Compl., ECF No. 1. These claims arise out of an
incident in which the Officers, responding to 911 calls from
Montel's home, shot and arrested Montel upon finding him
intoxicated and holding a hatchet. See id. Montel's sister,
Erica Cartagena, had called 911 because "she feared [Montel] was
going to kill himself." Pl.'s Statement Material Facts Supp.

Opp'n Defs. Mot. Summ. J. ("Pl.'s Facts Supp. Opp'n") ¶ 21, ECF No. 54. Montel sustained multiple serious injuries as a result of the shooting. Id. ¶¶ 53-57.

Springfield first moved for summary judgment on counts II, VI, and VII; the Officers moved for summary judgment on counts III, IV-V, VIII, and IX; and the parties fully briefed the issues. Def. City Springfield Mot. Summ. J. ("Springfield Mot."), ECF No. 44; Def. City Springfield Mem. Law Supp. Mot. Summ. J. ("Springfield Mem."), ECF No. 45; Defs. William Catellier, Luke Cournoyer, and Juan Rodriguez Mot. Summ. J. ("Officers' Mot."), ECF No. 47; Defs. William Catellier, Luke Cournoyer & Juan Rodriguez Mem. Law Supp. Mot. Summ. J. ("Officers' Mem."), ECF No. 48; Pl.'s Mem. Opp'n Mot. Summ. J. Defs. Officers William Catellier, Luke Cournoyer & Juan Rodriguez ("Montel Mem. Opp'n Officers"), ECF No. 52; Pl.'s Mem. Law Supp. Opp'n Def. City Springfield Mot. Summ. J. ("Montel Mem. Opp'n Springfield"), ECF No. 53.

This Court heard argument on these motions on November 29 and December 13, 2018. Electronic Clerk's Notes, ECF Nos. 68, 69. On January 9, 2019, after carefully reviewing the materials the parties presented and drawing all reasonable inferences in Montel's favor, this Court granted Springfield and the Officers' motions for summary judgment on counts II through IX. Order, ECF No. 77.

On January 16, 2019, Springfield moved for summary judgment on count I. Def. City Springfield Suppl. Mot. Summ. J. Count I Pl. Nicholas Montel Compl. ("Springfield Suppl. Mot."), ECF No. 84; Def. City Springfield Mem. Law Supp. Suppl. Mot. Summ. J. ("Springfield Mem. Suppl. Mot."), ECF No. 85.

This Court hereby GRANTS Springfield's motion for summary judgment on count I and explains the reasoning for its rulings on all of the claims in the memorandum that follows.

## A. Factual Background[1]

During the day of July 29, 2013, Montel consumed alcohol with his sister, Erica Cartagena ("Erica"), at their home. Defs.' Facts ¶¶ 5-9. Montel drank "much more than usual": Erica relates that he drank two 1.75-liter bottles of vodka, in addition to consuming marijuana. Id. By around 9:30 p.m., when Jesus Cartagena ("Jesus"), Erica and Montel's brother, arrived at the house, Montel was very intoxicated and acting in a

---

[1] This factual summary and the Court's analysis draw from the following sources: (1) Montel and his siblings' deposition testimony; (2) uncontested facts from the Officers' deposition testimony; (3) the Officers and Springfield's undisputed factual statements; and, where the parties dispute what happened, (4) Montel's statements of fact. See Defs. City Springfield, William Catellier, Luke Cournoyer, Juan Rodriguez, Trent Hufnagel & James Goldrick Undisputed Statement Fact Supp. Mots. Summ. J. Pls. Nicholas Montel, Erica Cartagena & Jesus Cartagena's Compls. ("Defs.' Uniform Facts"), ECF No. 46; Pl.'s Resp. Defs.' Statement Undisputed Material Facts Supp. Defs.' Mot. Summ. J. ("Pl.'s Resp. Facts"), ECF No. 55; Pl.'s Facts Supp. Opp'n.

strange and belligerent manner. Id. ¶¶ 2, 10-16. For example,
Montel "was punching everything in the kitchen, including the
fridge, the cabinets, the sink, the microwave, and the stove,"
id. ¶ 16, and he "hit himself in the leg and head," Pl.'s Facts
Supp. Opp'n ¶ 25.

Montel's agitation concerned Erica, who called 911 and
reported to the dispatcher that she feared that her brother was
suicidal. Pl.'s Facts Supp. Opp'n ¶ 27; Pl.'s Resp. Facts ¶ 24;
see also Defs.' Facts ¶¶ 18-19.

Officers Luke Cournoyer ("Cournoyer") and William Catellier
("Catellier") were together in a patrol car near 74 Irvington
Street, Montel's home, when they received a dispatch from the
Massachusetts State Police informing them of "unknown trouble"
at that address. Montel Mem. Opp'n Officers, Ex. 9, Dep. Tr.
Cournoyer 41:13-21, ECF No. 52-9; see also Montel Mem. Opp'n
Officers, Ex. 7, Dep. Tr. Catellier 15:15-16:22, ECF No. 52-7.
The dispatcher updated them about a minute later -- just as they
were arriving at the address -- that there was a "[s]ubject
inside attempting to commit suicide." Dep. Tr. Cournoyer 42:2-
15.[2]

---

[2] While Cournoyer recalls receiving this update when they
arrived, Dep. Tr. Cournoyer 42:6-10, the parties dispute whether
Catellier learned about the suicide risk before approaching the
house, see Pl.'s Resp. Facts ¶ 24. Catellier wrote in a police
report that just as he and Cournoyer arrived, "We were given
additional information about a suicide attempt." Catellier Dep.

Officer Juan Rodriguez ("Rodriguez") also received a call from the dispatcher informing him of "trouble" at 74 Irvington Street. Defs.' Facts ¶ 24. Officer Rodriguez arrived at the house just moments after Catellier and Cournoyer. Id. ¶ 25.

The entryway to the house was dark. Id. ¶ 26. Catellier approached the house first; Rodriguez and Cournoyer followed close behind. Id. ¶ 27.

Jesus stepped backward out of the house to find the Officers on the porch. Pl.'s Facts Supp. Opp'n ¶ 31. The Officers noticed blood on Jesus's shirt. Defs.' Facts ¶ 31.[3] Jesus requested that the Officers give him some space to "deal with his brother." Pl.'s Facts Supp. Opp'n ¶ 32. Montel claims that one of the Officers asked Jesus "what the fuck [he] was talking about," id. (alteration in original), and the Officers insisted on remaining, Defs.' Facts ¶ 31.

While Jesus and the Officers spoke, Montel opened the door. Pl.'s Facts Supp. Opp'n ¶ 34. Montel held a hatchet in his

---

Tr. 35:12-36:15. Later, Catellier testified that he did not learn that the call concerned a suicide risk until after the incident, claiming that he had stepped out of the car before Cournoyer received the second transmission. Id. at 15:15-16:18. In any event, for summary judgment purposes, the Court credits Montel's justifiable inference that at least two of the three officers at the scene were aware of the potential suicide risk. See Anderson, 477 U.S. at 255.

[3] A factual dispute remains as to whether the Officers also heard a woman's voice from inside the house. Compare Defs.' Facts ¶ 33 with Pl.'s Resp. Facts ¶ 33.

hand.  Id.  Immediately the Officers "ripped Jesus from the steps and grabbed Montel."  Id. ¶ 35.  Montel struggled while the Officers attempted to subdue him for three to five minutes. Id. ¶¶ 35-36.  During this struggle, Catellier "fell off the porch," id. ¶ 37,[4] and Rodriguez stepped off of the porch, Defs.' Facts ¶¶ 39, 41.

Montel denies that the Officers ever instructed him to drop the hatchet.  Pl.'s Resp. Facts ¶ 40.  But see Defs.' Facts ¶ 40.

Montel (with the hatchet still in hand) approached Catellier, who lay on his back at the bottom of the steps. Defs.' Facts ¶ 41.  Montel maintains that he "was not using" the hatchet and did not "have a chance to swing at the police officers."  Pl.'s Resp. Facts ¶¶ 36-37.

The distance between Catellier and Montel was -- at most -- that of a small porch and three stairs[5] when Catellier and Cournoyer discharged their firearms, striking Montel three times, once in each of his legs and once in his stomach, causing

_____

[4] The Officers dispute this characterization; they contend that "Montel threw Officer Catellier off of the porch."  Defs.' Facts ¶ 38.

[5] See Montel Mem. Opp'n Officers, Ex. 2, Dep. Nicholas Montel ("Montel Dep. Tr.") 152:13-24, ECF No. 52-2; Montel Mem. Opp'n Officers, Ex. 4, Dep. Erica D. Cartagena ("Erica Dep. Tr.") 128:9-129:14, ECF No. 52-4 (describing three stairs going up to a small porch and an entryway with two doors).

Montel to fall to the ground.  Pl.'s Facts Supp. Opp'n ¶¶ 39,
53.

Montel later "pled guilty to assault by means of a
dangerous weapon, assault and battery on a police officer, and
assault and battery by means of a dangerous weapon."  Id. ¶ 50.[6]

To treat the injuries that he sustained in the shooting,
Montel underwent multiple surgeries on his femur and liver, had
two small bowel resections, and had his gallbladder removed.
Id. ¶¶ 54-57.  Montel's current "physical disabilities include
but are not limited to chronic leg pain; wires, screws, and a
metal rod in his left leg; right knee pain; back pain; and
digestive issues including chronic stomach pain, constipation,
and persistent diarrhea."  Id. ¶ 59.

Following the incident, Montel "was diagnosed with severe
recurrent major depressive disorder, borderline personality
disorder, and post-traumatic stress disorder, with recurrent
experiences of hallucinations, sleeplessness, and nightmares."
Id. ¶ 52.

---

[6] While Montel describes his arrest as "unlawful," Compl.
¶ 82, he does not raise any claim for unlawful arrest.  See
generally Compl.  This Court thus takes notice of Montel's
arrest but does not entertain any challenge to its legality.

**B. Procedural History**

On July 28, 2016, Montel sued the Officers in their personal capacity and the City of Springfield. Compl. ¶ 1.

Montel alleged that the Officers violated and conspired to violate his civil rights under section 1983 and Massachusetts General Laws chapter 12, sections 11H and I (counts III, IV, and V). Compl. ¶¶ 97-105. Montel further alleged that the Officers intentionally inflicted emotional distress on him (count VIII). Id. ¶¶ 112-15. In addition, Montel alleged that the Officers committed assault and battery against him (count IX). Id. ¶¶ 116-19.

Montel claimed that Springfield violated his civil rights pursuant to section 1983 of title 42 of the United States Code ("section 1983") because it fostered a "custom and practice of . . . deliberate[] indifferen[ce] towards the rights of individual citizens" and grossly negligently hired, trained, and supervised its Officers (counts I and II). Id. ¶¶ 91-96. Montel further alleged that Springfield breached its duty "to exercise reasonable care" in general and by negligently hiring, training, and supervising the Officers (counts VI and VII). Id. ¶¶ 106-11.[7]

---

[7] In counts VI and VII of his complaint, Montel cited section 4 of chapter 258 of the Massachusetts General Laws, seeming to suggest that that provision creates a cause of action for negligence claims. In point of fact, that section of the

The Officers and the City of Springfield sought summary judgment on all counts. Springfield Mot.; Springfield Mem.; Officers' Mot.; Officers' Mem.; Springfield Suppl. Mot.; Springfield Mem. Suppl. Mot.

## II. **ANALYSIS**

The Officers seek qualified immunity for Montel's section 1983 claims. Officers' Mem. 7-11. For Montel's claims under sections 11H and 11I of chapter 12 of the Massachusetts General Laws (the "Massachusetts Civil Rights Act"), the Officers argue that Montel cannot show a violation of his rights by means of threats, intimidation, or coercion. Id. at 12-14. The Officers contend that Montel's intentional infliction of emotion distress ("IIED") claim must fail because their actions do not rise to the level of extreme and outrageous conduct beyond all bounds of decency. Id. at 14-15. Finally, the Officers maintain that they cannot be liable for assault and battery because their use of force was justified. Id. at 15-17.

Springfield argues that Montel cannot show "a constitutional violative act by the [Officers]," which dooms his

---

Massachusetts Tort Claims Act merely imposes presentment requirements for civil actions against public employers in the state. See, e.g., Pruner v. Clerk of Superior Court, 382 Mass. 309, 315-16 (1981) (applying section 4's presentment requirement).

claims against the City. Springfield Mem. 7-9; Springfield Mem. Suppl. Mot. 7-9.

As no genuine dispute of material fact exists as to any of Montel's claims against Springfield and the Officers, the Defendants are entitled to summary judgment on all counts.

## A. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. A court ought grant a motion for summary judgment if "there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

"[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 257. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." Id. at 249. Summary judgment will be granted when the

nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. A nonmoving party's "conclusory allegations, improbable inferences, and unsupported speculation are insufficient to establish a genuine dispute of fact." Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quoting Smith v. F.W. Morse & Co., Inc., 76 F.3d 413, 428 (1st Cir. 1996)) (internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient . . . ." Anderson, 477 U.S. at 252.

"[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Id. at 248. When adjudicating a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 256 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).

**B. Qualified Immunity**

Because the disputes in this case arose when the Officers were in the course of performing their official duties, this Court first inquires whether the Officers are entitled to

qualified immunity.  "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The Supreme Court repeatedly has stated that "immunity protects all but the plainly incompetent or those who knowingly violate the law."  Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting White v. Pauly, 137 S. Ct. 548, 551 (2018)); see also Mullenix v. Luna, 136 S. Ct. 305, 308 (2015); Malley v. Briggs, 475 U.S. 335, 341 (1986).

"Qualified immunity is an immunity from suit rather than a mere defense to liability."  Pearson v. Callahan, 555 U.S. 223, 237 (2009) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)) (internal quotation marks omitted).  As this Court has but recently explained:

> "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  City of Escondido, Cal. v. Emmons, 139 S. Ct. 500, 503 (2019) (quoting Kisela, 138 S. Ct. at 1152; Alfano v. Lynch, 847 F.3d 71, 75 (1st Cir. 2017).  "The doctrine's prophylactic sweep is broad: it leaves unprotected only those officials who, from an objective standpoint, should have known that their conduct was unlawful."  Alfano v. Lynch, 847 F.3d 71, 75 (1st Cir. 2017).  "Put another way, the doctrine protects all but the plainly incompetent or those who knowingly violate the law."  Id. at 75.
> "The qualified immunity analysis entails a two-step pavane."  Id.  "The first step requires an inquiring

court to determine whether the plaintiff's version of the facts makes out a violation of a protected right." Id. "The second step requires the court to determine whether the right at issue was clearly established at the time of defendant's alleged misconduct." Id. "These steps, though framed sequentially, need not be taken in order." Id. "The 'clearly established' analysis has two sub-parts." Id. "The first sub-part requires the plaintiff to identify either controlling authority or a consensus of cases of persuasive authority sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." Id.

"The first sub-part of this analysis must be undertaken in light of the specific context of the case, not as a broad general proposition." Id. at 76. The Supreme Court recently emphasized the heightened level of specificity required:

> This Court has repeatedly told Courts . . . not to define clearly established law at a high level of generality. That is particularly important in excessive force cases, as we have explained: Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue . . .

> [I]t does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.

City of Escondido, 139 S. Ct. at 503 (internal citations and quotations omitted).

> "The second sub-part asks whether an objectively reasonable officer in the defendant's position would have known that his conduct violated that rule of law." <u>Alfano</u>, 847 F.3d at 75. "The question is not whether the official actually abridged the plaintiff's constitutional rights but, rather, whether the official's conduct was unreasonable, given the state of the law when he acted." <u>Id.</u> at 75-76.

<u>Winfield</u> v. <u>Keefe</u>, 357 F. Supp. 3d 90, 92-93 (D. Mass. 2019) (internal citations and quotations omitted).[8]

### 1. Section 1983 Claims against the Officers (Excessive Force)

The Court considers first whether the Officers employed excessive force against Montel in violation of his Fourth Amendment rights and concludes that they did not.

A police officer's use of force does not violate an individual's Fourth Amendment rights if it is "objectively reasonable." <u>Graham</u> v. <u>Connor</u>, 490 U.S. 386, 397 (1989) (internal citations omitted). The application of this standard

> requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight . . . . The "reasonableness" . . . must be judged from the

---

[8] The expansion of qualified immunity in excessive force cases is not without its critics, chief among them Justice Sotomayor. <u>See</u> <u>Kisela</u> v. <u>Hughes</u>, 138 S. Ct. at 1155-62 (Sotomayor, J., dissenting); <u>see also</u> Kevin Hennessy, Case Comment, <u>Civil Rights -- Slamming Shut the Courthouse Doors: The Supreme Court's Expansive View of Qualified Immunity Kills Section 1983 Suits for Excessive Force at Summary Judgment -- Kisela v. Hughes, 138 S. Ct. 1148 (2018)</u>, 24 Suffolk J. Trial & App. Advoc. 144 (2018-2019).

perspective of a reasonable officer on the scene, rather
than with the 20/20 vision of hindsight.

Graham, 490 U.S. at 396 (citing Tennessee v. Garner, 471 U.S. 1,
8-9 (1985); Terry v. Ohio, 392 U.S. 1, 20-22 (1968)).

Moreover, the First Circuit is "comparatively generous to
officers facing potential danger, emergency conditions or other
exigent circumstances." McKenney v. Mangino, 873 F.3d 75, 81-82
(1st Cir. 2017) (quoting Roy v. Inhabitants of City of Lewiston,
42 F.3d 691, 695 (1st Cir. 1994)) (internal quotation marks
omitted).  Despite the extremity of a police officer's use of
deadly force, it can be reasonable when "a suspect poses an
immediate threat to police officers or civilians." McKenney,
873 F.3d at 81 (quoting Jarret v. Town of Yarmouth, 331 F.3d
140, 149 (1st Cir. 2003) (per curiam)).  Nonetheless, federal
courts afford "a special solicitude to suicidal individuals,"
especially when those individuals "pose no real security risk to
anyone other than themselves." McKenney, 873 F.3d at 82.

This is not such a case.  Even Montel's expert witness
opined that "[a] reasonable police officer in that situation may
have objectively perceived that Officer Catellier was in
imminent danger of serious bodily injury being imposed if
stricken with a blow from the hatchet." Montel Mem. Opp'n
Officers, Ex. 12, Stinson Expert Report ("Stinson Report") 4,
ECF No. 52-13.  Unlike in McKenney, where an armed and suicidal

individual remained almost 70 feet away from the police officer when he was shot, id. at 79, it is undisputed that Montel was within a few feet of Catellier when Catellier fired, see supra note 5. Further, from his position prostrate at the bottom of a set of stairs in a poorly lit entryway, Catellier Dep. Tr. 46:22-47:11, Officer Catellier lacked "clear visibility," unlike the officer in McKenney, who observed the armed individual from a distance on a clear and sunny morning, 873 F.3d at 77, 84.

Montel suggests that the Officers might not have needed to employ force at all had they engaged in best practices to "de-escalate potentially violent citizen encounters." Montel Mem. Opp'n Officers 6-7 (quoting Stinson Report 6). He provides an expert opinion regarding best practices for handling mental health emergencies, which include:

> (1) staging at a safe location down the block from the call for service address, (2) assessing the facts known to the dispatchers, (3) obtaining full situational awareness of the nature of the trouble within the home that resulted in the initial call(s) to 9-1-1 requesting police assistance in the first instance, (4) making telephone contact with the occupant(s) of the home to determine additional facts, and (5) planning, coordinating, and executing a tactical response based on the full assessment in consultation with police supervisors.

Stinson Report 6. While the Officers clearly did not deploy all of these tactics in responding to the call at 74 Irvington Street, Montel fails to show that a failure to do so was objectively unreasonable. See Officers' Mem. 9; cf. City & Cty.

16

of S.F. v. Sheehan, 135 S. Ct. 1765, 1777 (2015) (rejecting theory that qualified immunity was inappropriate because the police had failed to abide by expert witness's recommended practices and holding that "so long as a reasonable officer could have believed that his conduct was justified, a plaintiff cannot avoid summary judgment by simply producing an expert's report that an officer's conduct leading up to the deadly confrontation was imprudent, inappropriate or even reckless." (quoting Billington v. Smith, 292 F.3d 1177, 1189 (9th Cir. 2002), abrogated on other grounds by County of L.A. v. Mendez, 137 S. Ct. 1539 (2017))) (internal citations, quotations, and alterations omitted).

It is true that the Court ought not focus exclusively on the moment of the shooting but rather examine all of the Officers' conduct leading up to it in evaluating the excessive force claim. See Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 22 (1st Cir. 2005) (citing St. Hilaire v. City of Laconia, 71 F.3d 20, 26 (1st Cir. 1995)) (adopting a "broad view" approach to excessive force claims). But see Dickerson v. McClellan, 101 F.3d 1151, 1161-62 (6th Cir. 1996) (analyzing only "moments preceding the shooting"); Plakas v. Drinski, 19 F.3d 1143, 1150 (7th Cir. 1994) ("carv[ing] up the incident into segments and judg[ing] each on its own terms to see if the officer was reasonable at each stage"); see generally

Hon. Jack Zouhary, A Jedi Approach to Excessive Force Claims: May the Reasonable Force Be With You, 50 U. Toledo L. Rev. 1 (2018).

If Montel could show that the entirety of the Officers' actions in responding to the call to 74 Irvington Street -- taken together -- were not objectively reasonable, a Fourth Amendment violation might lie, even if Catellier's decision to fire was objectively reasonable in the moment. See St. Hilaire, 71 F.3d at 26. Proving the simple fact that the Officers could have reduced the likelihood of a violent encounter with a different course of action, however, does not establish a constitutional violation. See Napier v. Town of Windham, 187 F.3d 177, 188-89 (1st Cir. 1999).

Under the circumstances of this case, the Court holds that a jury could not find that no reasonable officer would engage in the conduct of Catellier, Cournoyer, and Rodriguez here. The Officers first approached a house to which they had been dispatched. Pl.'s Facts Supp. Opp'n ¶¶ 27-30. Upon seeing blood on the shirt of the man who met them at the door, the Officers reasonably suspected that danger was afoot and thus refused to leave until they could better understand the situation and ensure that everyone (including the individual who had called 911) was safe. Defs.' Facts ¶ 31; Pl.'s Facts Supp. Opp'n ¶ 27. When a man who appeared highly intoxicated

approached holding a dangerous weapon, the Officers did not fire their guns immediately but rather attempted to subdue him with less force for multiple minutes while he resisted. Pl.'s Facts Supp. Opp'n ¶¶ 34-38. These were the choices that led to the situation in which Montel approached Catellier on the ground holding a hatchet, none of which deprive the Officers' overall conduct of its objective reasonableness. See Napier, 187 F.3d at 188.

Montel fails to demonstrate a genuine dispute of material fact as to the reasonableness of the Officers' use of force. Because the Officers' use of force against Montel was objectively reasonable, the Court rules that there was no constitutional violation, and the Officers are entitled to qualified immunity on the substantive civil rights claim and the conspiracy claim. For this reason, the Court granted the Officers' motion for summary judgment on counts III and IV.

### 2. Massachusetts Civil Rights Act Claims against the Officers

Although the Officers do not raise it in the context of the state law claims, qualified immunity protects police officers from claims brought under the Massachusetts Civil Rights Act just as it does claims brought under section 1983. See Duarte v. Healy, 405 Mass. 43, 47 (1989). As the foregoing analysis makes clear, the Officers are entitled to qualified immunity for

their conduct in responding to the 911 call from 74 Irvington Street. As such, the Court granted the Officers' motion for summary judgment on count V.

### C. Intentional Infliction of Emotional Distress Claim against the Officers

The elements of an IIED claim under Massachusetts law are:

> (i) [the] defendant intended to inflict emotional distress or knew or reasonably should have known that emotional distress was likely to result from such conduct; (ii) the conduct was "extreme and outrageous," "beyond all possible bounds of decency," and "utterly intolerable in a civilized community"; (iii) the defendant's conduct proximately caused plaintiff's emotional distress; and (iv) the distress was so "severe that no reasonable man could be expected to endure it."

Davignon v. Clemmey, 322 F.3d 1, 8 n.2 (1st Cir. 2003) (quoting Agis v. Howard Johnson Co., 371 Mass. 140, 144-45 (1976)).

Montel's IIED claim fails because the Officers' conduct was not -- as matter of law -- "extreme and outrageous." See id. Montel's own expert witness conceded that the shootings were in response to the imminent risk that Catellier reasonably perceived. Stinson Report 6. Neither failure to employ police best practices, Montel Mem. Opp'n Officers 13, nor failure to provide a warning, id. at 12, bring Catellier's conduct anywhere near "extreme and outrageous" conduct. No reasonable jury could find that the Officers' use of force when an intoxicated individual holding a hatchet approached an officer who lay on

the ground, after resisting the Officers' attempts to subdue him, is the type of behavior that is "utterly intolerable in a civilized community." See Davignon, 322 F.3d at 8 n.2. As such, the Court granted the Officers' motion for summary judgment on count VIII.

### D. Assault and Battery Claim against the Officers

In Massachusetts, assault and battery is "the intentional and unjustified use of force upon the person of another, however slight, or the intentional doing of a wanton or grossly negligent act causing personal injury to another." Commonwealth v. McCan, 277 Mass. 199, 203 (1931). "The critical question in an assault and battery claim against a police officer is whether the officer used intentional and **unjustified** force upon the person of another." Rose v. Town of Concord, 971 F. Supp. 47, 51 (D. Mass. 1997) (citing Powers v. Sturtevant, 199 Mass. 265, 266 (1908)). "The standard for determining whether force is reasonable for assault and battery claims is essentially the same as the standard for determining if force is reasonable for Fourth Amendment excessive force claims." Titus v. Town of Nantucket, 840 F. Supp. 2d 404, 417 (D. Mass. 2003) (quoting Parker v. Town of Swansea, 270 F. Supp. 2d 92, 102 (D. Mass. 2003) (Dein, M.J.)). Thus, an assault and battery claim "will rise or fall in the same manner as" an excessive force claim

challenging the same conduct. <u>Jesionowski</u> v. <u>Beck</u>, 937 F. Supp. 95, 105 (D. Mass. 1996) (Collings, M.J.).

As analyzed above, even when taking all reasonable inferences in his favor, Montel failed to demonstrate a genuine issue of fact as to the reasonableness of the Officers' use of force against him. Therefore, the Court granted the Officers' motion for summary judgment on count IX.

**E. Section 1983 Claims against Springfield**

Montel alleged that Springfield violated his rights pursuant to section 1983 because it fostered a "custom and practice of . . . deliberate[] indifferen[ce] towards the rights of individual citizens" and grossly negligently hired, trained, and supervised its Officers (counts I and II). Compl. ¶¶ 91-96.

Springfield is only liable under section 1983 if the execution of a policy, practice, or custom of the City caused a violation of Montel's constitutional rights. <u>See</u> <u>Monell</u> v. <u>Department of Soc. Servs.</u>, 436 U.S. 658, 663 n.7, 694 (1978); <u>Baron</u> v. <u>Suffolk Cty. Sheriff's Dep't</u>, 402 F.3d 225, 236 (1st Cir. 2005), <u>abrogated on other grounds by</u> <u>Jennings</u> v. <u>Jones</u>, 587 F.3d 430 (1st Cir. 2009).

Because Montel does not proffer sufficient evidence of a constitutional violation to overcome summary judgment on counts

I and II, his claim for municipal liability premised on such a violation fails.  This Court need go no further.[9]

---

[9] While there can be no municipal liability under section 1983 without an underlying constitutional violation, <u>Monell</u>, 436 U.S. at 691-92, the Court is troubled by Montel's allegations about the limited training on mental health emergencies that Springfield provides to its police force.  <u>See</u> Montel Mem. Opp'n Springfield 5-8 (quoting Officers' testimony that they either did not receive any training on handling suicide calls or that they had not received such training in over a decade).

A failure to train police officers can amount to an official government policy subject to <u>Monell</u> municipal liability when a municipality's failure to train "amounts to deliberate indifference to the rights of people with whom the police come into contact." <u>City of Canton</u> v. <u>Harris</u>, 489 U.S. 378, 388 (1989).  A plaintiff can show "deliberate indifference" by demonstrating that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." <u>Id.</u> at 390.  A pattern of constitutional violations can put a municipality on notice of a training need, but liability can also attach from a single violation of constitutional rights when such a violation was "a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." <u>Board of the Cty. Comm'rs</u> v. <u>Brown</u>, 520 U.S. 397, 409 (1997).

Given that suicide rates in Massachusetts have increased substantially in recent years, <u>Suicide Rising across the US</u>, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/vitalsigns/suicide/infographic.html (last visited June 13, 2019) (reporting more than 35% increase in Massachusetts suicide rate between 1999 and 2016), and that almost all mental health providers recommend calling a police dispatcher as a first step in a mental health emergency, <u>see, e.g.</u>, <u>Suicide in America: Frequently Asked Questions</u>, Nat'l Inst. of Mental Health, https://www.nimh.nih.gov/health/publications/suicide-faq/index.shtml (last visited June 13, 2019) (recommending calling 911 in a mental health emergency), violations of federal rights seem an increasingly likely consequence of a failure to equip law enforcement officers with the tools to handle such emergencies.

### F. Negligence Claims against Springfield

Montel did not brief his negligence claims against the City of Springfield, except to the extent that he argued that "the negligence of the City in failing to properly train and re-train their police Officers" established liability under section 1983. Montel Mem. Opp'n Springfield 5. At most, this is a rephrasing of Montel's <u>Monell</u> failure to train claim, which failed (as discussed above) for want of an underlying constitutional violation.

As such, this Court granted Springfield's motion for summary judgment on Montel's Massachusetts common law negligence claims (counts VI and VII).

## III. CONCLUSION

Based on the above analysis, this Court GRANTED the Defendants' motions for summary judgment as to counts II through

---

When nearly half of those killed by police in Massachusetts between 2005 and 2015 were mentally ill and a third of those injured in police shootings during that time period were undergoing a mental health crisis, Spotlight Team, <u>Families Failed by a Broken Mental Health Care System Often Have No One to Call But Police</u>, Boston Globe (July 6, 2016), https://apps.bostonglobe.com/spotlight/the-desperate-and-the-dead/series/police-confrontations/ (last visited March 26, 2019), municipalities would best take notice that a failure to train their law enforcement officers to manage safely these "recurring situations," <u>Brown</u>, 520 U.S. at 409, may amount to "deliberate indifference," <u>City of Canton</u>, 489 U.S. at 388, were a constitutional violation to occur.

IX, ECF No. 77, and hereby GRANTS the City of Springfield's motion for summary judgment as to count I, ECF No. 84.

**SO ORDERED.**

WILLIAM G. YOUNG
DISTRICT JUDGE